**ERIE RESISTOR CORPORATION and Clevite Corporation**

v.

**UNITED STATES.**

No. 147–56.

United States Court of Claims.

June 8, 1960.

Ralph Hammar, Erie, Pa., and Harry C. Page, Cleveland, Ohio, for plaintiffs. Miles D. Pillars, Washington, D. C., on the brief.

Michael W. Werth, Washington, D. C., Asst. Atty. Gen. George Cochran Doub, for defendant.

PER CURIAM.

This case which is a patent suit under the provisions of 28 U.S.C. § 1498 was referred pursuant to Rule 45(a), 28 U.S. C.A., to Donald E. Lane, a trial commissioner of this court, with directions to make findings of fact and to recommend conclusions of law which the commissioner has done in a report filed October 15, 1959.

The court, having considered the evidence, the briefs and argument of counsel and being in agreement with the conclusions reached by the commissioner, adopts his opinion and findings as hereinafter set forth as the basis for its judgment in this case. It is concluded that the Gray patent No. 2,486,560 is valid and that claims 1, 2, 11, 12 and 15 thereof have been infringed by defendant. Plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use, and judgment will be entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c).

It is so ordered.

Opinion Of Commissioner.

This is a patent suit under the provisions of Title 28 U.S.C. § 1498, in which plaintiffs seek to recover reasonable and entire compensation for unauthorized use of a patented invention. The plaintiffs charge infringement of claims 1, 2, 3, 4,

5, 6, 7, 11, 12, and 15 of Gray patent No. 2,486,560, issued to plaintiff Erie Resistor Corporation on November 1, 1949, on an application for patent filed in the U.S. Patent Office on September 20, 1946. Erie Resistor Corporation is a corporation of Pennsylvania. Plaintiff Clevite Corporation is a corporation of Ohio and is exclusive licensee under the Gray patent. The parties have agreed to a separation of issues for trial. The questions of infringement and validity of the selected patent claims are now before the court.

The Gray patent relates to a transducer for translating mechanical vibrations to electrical voltages of corresponding wave form. Certain technical terms used in this opinion may be more readily understood by reference to the definitions given in the accompanying findings.

The transducer disclosed in the Gray patent is made of polarized barium titanate. The selected claims of the Gray patent recite a transducer having as an active ingredient barium titanate in a specified state, or recite a method of making such a transducer. For example, claim 2 recites a transducer having as an active ingredient barium titanate polarized by bound charges. Claim 15 recites the method of making a transducer which comprises subjecting a barium titanate ceramic to a polarizing voltage at the temperature at which the crystals transform from the cubic to the tetragonal. Each of the several patent claims in suit is more specifically set forth in the findings.

Barium titanate was first developed as insulation for electrical condensers used in radio and other applications. This use was the subject of extensive testing during World War II in the effort to secure acceptable substitutes for mica insulation then in short supply. During the testing of the insulation ability of barium titanate, it was found that the material in some instances had unusual properties. Gray participated in such testing and discovered that barium titanate could be polarized, i. e., be made piezoelectric, by the application of a direct current voltage to the opposite faces of the material. Such polarization produces lasting piezoelectric properties in the barium titanate material. Gray made and successfully tested a polarized barium titanate transducer in the form of a phonograph pickup device, the device illustrated in his patent drawings.

Polarized barium titanate is a piezoelectric material which, when subjected to mechanical pressure or bending, develops an electrical voltage. The application of electrical voltages to such a piezoelectric material causes mechanical movement or vibration of the material. Transducers made from polarized barium titanate are useful in phonograph pickup devices, microphones, sound detection apparatus, etc. Polarized barium titanate is a satisfactory substitute for other piezoelectric materials such as quartz and Rochelle salt. Barium titanate ceramics are economically prepared by firing in a kiln mixtures of barium and titanium oxides.

Defendant has contended that the selected claims were not infringed because defendant's transducer material was a solid solution rather than a homogeneous barium titanate. The patent claims in suit do not exclude solid solutions. The Gray patent specification discloses the possibility of mixing other titanates with the barium titanate to obtain a solid solution. The materials produced for defendant's use and procured by defendant were predominantly barium titanate. Defendant's barium titanate transducers were made basically of the same ceramic disclosed in the Gray patent, and were polarized by an applied voltage to obtain the same piezoelectric properties. Claims 1, 2, 11, 12, and 15 of the Gray patent have been infringed by defendant. As indicated in the findings, the evidence is not sufficient to support a finding that the accused Centralab and Gulton transducer elements actually have their barium titanate crystals oriented in the specific directions set forth in claims 3, 4, 5, 6, and 7 of the Gray patent. Since the other claims in suit are found infringed and valid, no findings with re-

spect to the infringement and validity of claims 3 through 7 are necessary.

Defendant has also contended that the patent claims in suit are directed to the expected result of an old method, or directed to an old product or material. Numerous prior publications and patents, and numerous allegations of prior knowledge offered by defendant as invalidating the Gray claims are considered in detail in the accompanying findings.

Pertinent sections of the patent statutes specify:

"§ 102.   Conditions for patentability; novelty and loss of right to patent

"A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

"(c) he has abandoned the invention, or

\*   \*   \*   \*   \*   \*

"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

"(f) he did not himself invent the subject matter sought to be patented, or

"(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.   \*   \*   \*."

"§ 103.   Conditions for patentability; non-obvious subject matter

279 F.2d—15½

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.   Patentability shall not be negatived by the manner in which the invention was made."   [Title 35, U.S.C.]

The Ginsburg technical paper, first published in Russia less than one year prior to the Gray application for patent, discloses theories on the properties of Rochelle salt and barium titanate.   The article clearly states that the problems involved need a more detailed experimental investigation.   In response to letters rogatory, Ginsburg stated that he was not the author or co-author of any published work which describes the making of a useful transducer from polycrystalline barium titanate fired to produce a ceramic, electroded and polarized by direct current voltage applied to its electrodes.   The theoretical surmises stated in the Ginsburg paper do not constitute a description of the invention recited in the claims in suit, nor did they teach one skilled in 1945 in the transducer art that barium titanate can be polarized to produce a useful transducer.

The 1885 article by Heaviside discloses general electrification theories but not barium titanate.   The 1932 Meissner patent discloses the action of electric fields but not on barium titanate.   In discovering that a useful transducer could be made by polarizing a barium titanate polycrystalline ceramic, Gray produced a new and patentable product and method. The work of Brandt and Howatt in defendant's laboratories did not result in a useful transducer.   Theoretical surmise or guesswork as to what caused certain electrical condensers to be noisy and unsatisfactory was not a knowledge that barium titanate could be made in the

form of a transducer if polarized by a direct current voltage.

Test work and plant expansion under a supply contract and loans from defendant during World War II did not give defendant a royalty-free license under every invention made at the Erie Resistor Corporation. The supply contract dated April 25, 1944, covers the procurement of condensers made in accordance with defendant's Fort Monmouth Signal Laboratory specifications and does not cover research and development in the transducer field. The modifications and amendments to this contract likewise did not bring transducers within its scope.

The test work of Wainer and Wiley and other engineers and scientists cited by defendant never resulted in a useful transducer. Wainer and others were concerned with the development of condenser insulating materials, not transducers. In spite of the vast amount of knowledge concerning barium titanate as an insulating material for condensers, no one before Gray discovered that a useful transducer could be made from polarized polycrystalline barium titanate. The general theories as to crystal stress and orientation set forth by Gray in his patent application may now be out of date. The theory disclosed in a patent application is immaterial where the application discloses how to produce a new and useful product and/or method. Eames v. Andrews, 122 U.S. 40, 56, 7 S.Ct. 1073, 30 L.Ed. 1064.

It is recommended that the court find that Gray patent No. 2,486,560 is valid and that claims 1, 2, 11, 12 and 15 thereof have been infringed by defendant without authorization of the patent owner.

### Findings of Fact.

1. This is a patent suit brought under the provisions of Title 28 U.S.C. § 1498. Plaintiffs seek to recover reasonable and entire compensation for the unauthorized use and manufacture by or for the United States of plaintiffs' patented invention. United States Letters Patent No. 2,486,560, entitled "Trans-ducer and Method of Making the Same", issued November 1, 1949, to plaintiff Erie Resistor Corporation on an application for patent filed September 20, 1946, by one Robert B. Gray. This patent will be referred to hereinafter as the Gray patent.

2. Plaintiff Erie Resistor Corporation, hereinafter called Erie, is a corporation of the State of Pennsylvania, and has been the holder of legal title in and to the Gray patent since the patent issued. Plaintiff Clevite Corporation, hereinafter called Clevite, is a corporation of the State of Ohio, and, as successor to the business and assets of the Brush Development Company, is exclusive licensee under the Gray patent.

3. The parties agreed at pretrial to a separation of issues for trial, and that the issues of validity of the Gray patent and of infringement of the Gray patent by defendant be first determined upon full proofs, argument of counsel, and findings of fact. Each plaintiff herein was represented by its own counsel at the trial.

4. The subject matter of the Gray patent and of matters presented at trial by defendant involves technical terms, the more important of which may be defined as follows:

"A *crystal* is a solid body formed by the solidification of a chemical element, compound or mixture, and is generally bounded by plane surfaces symmetrically arranged at fixed angles to each other and expressing definite internal structure of the crystal.

"A *piezoelectric* crystal is a crystal which when subjected to stress, for example squeezed, develops electric charges of opposite sign on opposite sides of the crystal, positive charges on one side and negative charges on the other side. A portable demonstration apparatus including a *piezoelectric* transducer which, when stressed by a blow, develops enough electrical potential to light a neon lamp, is plaintiffs' exhibit 5 herein.

"A *pyroelectric* crystal is a crystal which when subjected to a temperature change, for example heated, develops electric charges of opposite sign on opposite sides of the crystal. Some piezoelectric crystals may also be pyroelectric.

"A *ferroelectric* material is a material having electrical properties similar in some respect to the magnetic properties of iron. A graph of the electrical charge on a condenser of ferroelectric material, with respect to the voltage applied to the condenser, is not a straight line but is a curve called a hysteresis loop.

"A *dielectric* material is a nonconductor of electricity.

"An *electret* is a body of dielectric material in which a permanent state of electrostatic polarization has been set up.

"A *condenser*, sometimes referred to as a *capacitor*, is a device for storing electric charges and consists of one or more pairs of conductors or electrodes separated or insulated from each other by a dielectric material. *Condensers* are commonly identified by the kind of dielectric used. A condenser having a ceramic dielectric is a ceramic condenser.

"A *transducer* is a device actuated by power from one system for supplying power to a second system. More simply stated, it is a device for converting mechanical effects into electrical effects and vice versa. Specific examples of transducers are phonograph pickups, ultrasonic generators, underwater sound devices called hydrophones, and telephone receivers.

"*Barium titanate*, represented by the symbol $BaTiO_3$, is a chemical compound of elements barium, titanium and oxygen. Barium titanate powder has been commercially available and may be formed by reacting titanium oxide with barium carbonate.

"A *polycrystalline* ceramic is a ceramic consisting of a jumbled mass of small crystallites or crystals having no regular geometric pattern of arrangement in the mass.

"A *tetragonal* crystal is a crystal having all three of its crystal axes at right angles, and having its two lateral axes equal.

"The *transformation temperature,* sometimes referred to as the Curie point, is that temperature at which the crystal structure of a material changes, and for barium titanate material is about 120° Centigrade.

"*Polarization* is an effect produced in a piece of dielectric material when placed in an electric field and appears to include some displacement of the positive charge in each atom, with reference to the negative charge, in the direction of the electric field."

5. Specimens of various piezoelectric materials in the form of single crystals, such as quartz, Rochelle salt, and ADP (ammonium dihydrogen phosphate), form a part of plaintiffs' exhibit 4 herein. Such single crystals are characterized by their precise jewel-like shapes. The present suit is concerned with polycrystalline piezoelectric materials as distinguished from single crystals, and is concerned more particularly with transducers using piezoelectric barium titanate crystals and with methods of treating barium titanate ceramics.

6. The specification of the Gray patent begins:

"This invention is a transducer for translating mechanical vibrations to alternating electrical voltages of corresponding wave form making use of a ceramic such as $BaTiO_3$ in tetragonal crystalline state.

"In a preferred form the ceramic is subjected to a charging voltage and also to a mechanical stress while

cooling from the temperature range at which the crystalline structure transforms from the cubic to the tetragonal. As the ceramic is cooled below the transformation temperature a portion of the charge is in effect permanently fixed or bound on the interfaces of the crystals producing in effect a ceramic electret. Both the charging voltage and the mechanical stress contribute to the orientation of tetragonal crystals in the preferred direction. The permanent charge results in a piezoelectric effect when the crystal is subjected to mechanical vibration. The response is linear. One use is for phonograph pickups where the mechanical ruggedness and ability to withstand extreme temperatures are additional practical advantages. Other uses are in microphones and speakers. * * *"

7. The Gray patent contains illustrative drawings which are reproduced below.

Nov. 1, 1949.    R. B. GRAY    2,486,560

TRANSDUCER AND METHOD OF MAKING THE SAME

Filed Sept. 20, 1946

FIG. 1.

FIG. 2.

FIG. 3.

FIG. 4.

FIG. 5.

FIG. 6.

8. The specification of the Gray patent describes the drawings, the transducers illustrated in figures 1 and 2, and methods of making transducers, as follows:

"In the drawing, Fig. 1 is an end elevation of a phonograph pickup; Fig. 2 is a perspective view of a modification; Fig. 3 is a perspective of one of the tetragonal crystals; Fig. 4 is a diagrammatic view illustrating the production of the piezo-electric effect by the bound charges; Fig. 5 is a diagram showing the effect of tension and compression on the dielectric constant; Fig. 6 is a diagram illustrating the exponential decay of changes in dielectric constant produced by mechanical or electrostatic stress.

"Referring to the drawing, 1 indicates a phonograph needle held in a metal chuck 2 by a thumb screw 3, and 4 indicates a metal block fixed in the arm. Between the chuck and block is a tubular ceramic condenser 5 having its ends fixed in sockets 6 and 7 in the chuck and block. An outer metalized coating 8 is soldered to the chuck and an inner metalized coating 9 is connected by a lead 10 to the block. The coatings are the condenser electrodes.

"The ceramic comprises poly-crystalline $BaTiO_3$ having a substantial part in the tetragonal crystalline state. In the manufacture, the $BaTiO_3$ is mixed with addition agents such as clay or bentonite primarily for the purpose of making the mixture easier to work, and is then pressed into shape and fired at an elevated temperature, e.g. 2200°–2500° F. to form a dense ceramic. High temperature firing and addition agents such a bentonite which promote grain growth and increase the crystal size are preferred. The metal coatings 8 and 9 are then applied, for example as a silver paint, and fixed by firing at from 250° to 1400° F. The condenser is then activated by heating the condenser to the transformation temperature of about 120° C. while applying a voltage between the coatings 8 and 9 until the condenser has cooled below the transformation temperature. It is not necessary that the voltage be continuously applied until the ceramic has cooled below the transformation temperature although it is preferable. At temperatures above the transformation temperatures, or more accurately, above the range of temperatures at which the transformation takes place, $BaTiO_3$ has a cubic crystal structure. Below the transformation temperature the crystal structure is predominantly tetragonal, as shown in Fig. 3, comprising two square end faces of 3.99 Angstrom units on each side and four rectangular faces having a length of 4.03 Angstrom units. There may be some cubic crystals remaining. The voltage between the coatings produces a permanent polarization probably resulting from charges on the interfaces of the crystals. In effect the activated condenser is a ceramic electret as diagrammatically indicated in Fig. 4.

\* \* \* \* \* \*

"In the pickup shown in Fig. 1, the tetragonal crystals are oriented along the axis of the ceramic tube by the charging voltage applied to the coatings 8 and 9 while cooling from the transformation temperature. The orientation is due solely to the electrical stress. In Fig. 2 is shown a pickup in which the ceramic is also mechanically stressed, thereby producing a better or more complete orientation. Both stresses have the same orienting direction. The added mechanical stress permits more complete orientation without excessive charging voltages.

"In Fig. 2 an angular metal block 19 fixed in the tone arm has a $BaTiO_3$ ceramic disc condenser 20 having a metalized coating 21 soldered on one face to one arm of the block and a strip spring 22 soldered to the other

arm, of the block. A metal bracket in the plane of the disc is soldered to the coating 21 and the spring 22 while the spring is bent toward the condenser. The amount of tension is controlled by the stiffness of the spring and the amount of bending. While the ceramic is under tension, it is heated to and then cooled from the transformation temperature while a charging voltage is applied between the coating 21 and a metal coating 23 on the opposite face. Both the tension and the charging voltage contribute to orientation of the tetragonal crystals in the plane of the disc. In use the block, 19, is mounted in the tone arm so the spring, 22, extends along the record groove. A needle, 24, in a chuck, 25, on the projecting end of the spring transmits the undulation of the groove to the condenser as a mechanical vibration in line with the orientation of the tetragonal crystals produced by the spring tension. This results in a voltage between the coatings, 21 and 23, appearing in leads, 26 and 27, linearly proportional to the amplitude of the needle movement. The voltage is somewhat greater due to the better or higher percentage preferred orientation of the tetragonal crystals."

9. The specification of the Gray patent summarizes the advantages of the invention as follows:

"Among the advantages of the barium titanate transducer are low cost, mechanical strength and resistance to shock, high output and linear response, and stability. The change in performance with temperature and aging is not objectionable. If the activation should be destroyed by an excessively high temperature the transducer can be easily reactivated."

10. Plaintiffs rely upon claims 1, 2, 3, 4, 5, 6, 7, 11, 12, and 15 of the Gray patent. The first seven patent claims are directed to transducers as an article of manufacture. Claims 11, 12, and 15 are directed to methods of making a transducer and polarizing a barium titanate ceramic. Claims 1 through 5 recite [Emphasis added]:

"*A transducer having as an active ingredient barium titanate—*" and define the barium titanate as follows:

"Claim 1.—in tetragonal crystalline state.

"Claim 2.—polarized by bound charges.

"Claim 3.—in tetragonal crystalline state stressed at the transformation temperature to orient the crystals in the preferred direction.

"Claim 4.—in tetragonal crystalline state with the crystals oriented in the direction of vibratory movement.

"Claim 5.—in tetragonal crystalline state with the crystals oriented in the direction of vibratory movement and polarized in a direction transverse to the direction of vibratory movement by bound charges."

Claim 6 recites:

"*A transducer comprising a ceramic* having spaced faces provided with metalized coatings, said ceramic having as an active ingredient barium titanate in tetragonal crystalline state with the crystals oriented along the faces and polarized in a direction transverse to the faces by bound charges."

Claim 7 is similar to claim 6 but recites the active ingredient as *a solid solution of* barium titanate. The three method claims in suit read as follows:

*"Claim 11*

"The *method of activating* a barium titanate ceramic to produce a piezo-electric effect which comprises subjecting the ceramic to a polarizing voltage at the temperature at which the crystals transform from the cubic to the tetragonal.

*"Claim 12*

"The *method of making a transducer* which comprises treating a

barium titanate ceramic to promote grain growth, and subjecting the ceramic to a polarizing voltage at the temperature at which the crystals transform from the cubic to the tetragonal.

#### "Claim 15

"The *method of making a transducer* which comprises subjecting a barium titanate ceramic to a polarizing voltage at the temperature at which the crystals transform from the cubic to the tetragonal."

11. The specification of the Gray patent teaches activiating a barium titanate condenser by heating the condenser to the transformation temperature of about 120° Centigrade, while applying a charging voltage between coatings and preferably until the condenser has cooled below said temperature. The patent specification teaches that a better percentage of preferred orientation of tetragonal crystals results from mechanically stressing the ceramic, as by tension, during the activating procedure. A portion of the activating charge is in effect permanently fixed or bound on the interfaces of the barium titanate ceramic to produce a piezoelectric effect when the ceramic is subjected to mechanical vibration. The patent specification does not disclose a specific value for the charging voltage or the time required to activate a given barium titanate ceramic. There is evidence that selection of suitable voltages is within the knowledge of one having ordinary skill in this field, and also that activation may be accomplished at temperatures below the transformation temperature. The technical theory included in the specification of the Gray patent when filed in 1946 is not reproduced in this report, since applicants for letters patent are not required either to know or disclose proper theoretical explanations of their discoveries. In its broadest aspects, the Gray patent is based upon the discovery that polycrystalline barium titanate subjected to a polarizing voltage develops useful piezoelectric properties. Barium titanate condensers, as distinguished from transducers, have

been in regular production by Erie since 1942. A barium titanate condenser *per se* does not naturally have the property of piezoelectricity. The actual phonograph pickups from which figures 1 and 2 of the Gray patent drawings were made are in evidence in the present suit as plaintiffs' exhibits 34 and 35. The specification of the Gray patent, while disclosing the active ingredient of the transducer as polarized barium titanate ceramic, recognizes that other ingredients may be present in the ceramic either as inert ingredients or as ingredients which modify the transducer characteristics.

12. The occurrence of useful piezoelectric crystals, such as quartz, in nature is rare. The process of artificially growing piezoelectric crystals of adequate size is long and expensive. Instead of utilizing a single crystal of relatively large size, it is less expensive to use a compact mass of small crystals more easily produced than the large single crystals. Some sand is primarily quartz, and each crystal is piezoelectric. A jumbled mass of sand crystals does not produce a useful piezoelectric material since the charges cancel each other. *Polarizing* is the feature which makes the difference between a mere piece of ceramic and a piece of material having the useful property of piezoelectricity. Defendant's expert, Dr. Smith, testified that *unpolarized* barium titanate is not piezoelectric at any temperature, and testified further that he did not know of any case where a piezoelectric element was obtained from a *polycrystalline* ceramic material before it was obtained from barium titanate.

#### Infringement Issue.

13. Plaintiffs contend that claims 1, 2, 4, 5, 6, and 7 of the Gray patent have been infringed by transducers made by or for the defendant from polarized barium titanate ceramic elements manufactured by Centralab Division of Globe-Union, Inc., and by Gulton Manufacturing Company. Plaintiffs contend that claims 3, 11, 12, and 15 have been infringed by ceramic elements manufac-

240

tured for defendant by Centralab Division, Globe-Union, Inc., where polarizing was carried out by applying a polarizing voltage with the ceramic heated to the transformation temperature of about 125° Centigrade.

14. Defendant's military specification MIL–L–12815 (ORD), dated June 12, 1953, plaintiffs' exhibit 1, covers "luckies" for use in super-quick impact ordnance. This specification states in part:

> "3. REQUIREMENTS
>
> "3.1 *Material*
>
> "3.1.1 The lucky shall consist of polarized barium titanate ceramic with permanently attached electrodes and such additive substances as may be necessary to stabilize the polarization against temperature and ageing."

Defendant's military specification MIL–L–12939 (ORD), dated August 4, 1953, plaintiffs' exhibit 6–B, covers the lucky assembly for use with the M31 Heat Rifle Grenade, and includes the same material requirement quoted above. This specification refers to Ordnance Corps drawing 82–2–53, dated August 6, 1953, plaintiffs' exhibit 6–A, entitled "Lucky Assembly and Details." Said drawing shows a molded ceramic barium titanate lucky of hemispherical shape, and specifies:

> "F—After soldering Lucky assembly, polarize in a saturation field at approximately 4500 volts, d.c."

Defendant's military specifications noted above and referenced drawing do not specify either time or temperature limits for the polarizing step. U.S. Navy Underwater Sound Laboratory drawing 34713–B, dated July 9, 1952, plaintiffs' exhibit 2, entitled Cylinder Barium Titanate, specifies the material as follows:

> "*Mat'l. Spec.*
>
> "Polarized Barium Titanate with 5% $CaTiO_3$ added. Brush Development Company Ceramic 'B' or equal."

A later Underwater Sound Laboratory drawing 40436–C, dated October 3, 1955,

plaintiffs' exhibit 3, entitled Barium Titanate Acoustic Element, shows a ceramic element of polarized barium titanate.

15. Drawing D 11899–B of the Centralab Division of Globe-Union, Inc., dated June 4, 1953, plaintiffs' exhibit 6–C, is entitled Hemisphere Assembly (Picatinny Drawing P83051A), and shows a hemispherical lucky assembly similar to that illustrated in Ordnance Corps drawing 82–2–53, mentioned above, and specifies:

> "D. Barium Titanate Ceramic (Commercial)
>
> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
>
> "K. After assembly polarize in a saturated field at approx. 4500 volts d.c."

There is evidence that Central Laboratories (Centralab), as subcontractor to Screw Machine Products Company, produced in 1955 at least 603,000 lucky assemblies for defendant per military specification MIL–L–12939 and drawing 82–2–53.

16. A project engineer for piezoelectric ceramics and a vice-president in charge of engineering, both employed by Centralab Division, Globe-Union, Inc., testified that during the 6-year period preceding the filing of plaintiffs' petition herein Centralab manufactured and delivered polarized barium titanate in accordance with defendant's military specification MIL–L–12815 (ORD), relating to lucky. Centralab supplied such materials to Weatherhead Corporation and supplied similar materials to Bendix Aviation Corporation and other prime contractors for end use by defendant. Weatherhead Corporation supplied lucky devices from Centralab to defendant. Materials supplied by Centralab were assembled at one of defendant's arsenals.

17. The transducer elements manufactured by Centralab for defendant's use were made from powdered titanates. Approximately 96% barium titanate and about 4% lead titanate were mixed and dried, fluxes and binders were added, the mixture was pressed into desired shapes and was fired at about 2,500° F.

to produce a dense ceramic containing tetragonal crystals at normal temperatures. The fired ceramic was then polarized at Centralab by application of an electric voltage to electrodes on the ceramic. The applied voltages were between 25 and 50 volts per mil (0.001 inch) thickness and were applied while the temperatures of the ceramic elements were decreased from above to below the transformation point temperature of about 125° Centigrade. The lead titanate present in Centralab transducer elements was not enough to materially affect the transformation point temperature. The Gray patent specification describes the possibility and the effects of mixing other titanates with barium titanate, and specifies that a wide variety of ingredients which do not affect the transformation temperature may be added.

18. Laboratory tests of samples of accused Centralab transducer elements were made by plaintiffs before trial and repeated in the presence of defendant's counsel and the trial commissioner. Tests included spectographic emission examination and X-ray fluorescent tests to determine composition, X-ray diffraction tests to determine crystalline structure, and electrical resonance and antiresonance frequency tests, stress tests, strain tests, and heat tests to determine the piezoelectric properties of the sample elements. The results of the tests and the testimony of experts show that the accused transducer elements made by Centralab include as an active ingredient barium titanate in tetragonal crystalline state as recited in Gray patent claim 1, and include polarized barium titanate as recited in Gray patent claim 2. The accused Centralab transducer elements were manufactured by subjecting a barium titanate ceramic to a polarizing voltage at the transformation point temperature as recited in Gray patent claims 11, 12, and 15 directed to methods of activating or making barium titanate ceramic transducer elements. Claims 1, 2, 11, 12, and 15 of the Gray patent in suit were infringed by the transducers made

by Centralab for defendant's use in accordance with defendant's specifications.

19. The evidence with respect to the *orientation* of the barium titanate crystals in the accused Centralab transducer elements is not sufficient to warrant a positive finding that said crystals are oriented in the preferred direction, oriented in the direction of vibratory movement, and/or oriented along the faces, as specifically recited in Gray patent claims 3–7 inclusive. No finding is made that these particular patent claims have been infringed by defendant.

20. With respect to the accused transducer elements manufactured by Gulton for defendant's use, a vice-president of Gulton Industries testified that the normal practice at the Gulton Manufacturing Company was to polarize barium titanate transducer material *cold* or at temperatures below the Curie point temperature. Gulton produced for defendant's end use transducers predominantly barium titanate and equivalent electrically to the material specified in defendant's specifications mentioned in finding 14 above. The accused transducer elements made by Gulton included as an active ingredient barium titanate in tetragonal crystalline state as recited in Gray patent claim 1, and included polarized barium titanate as recited in Gray patent claim 2. The Gulton transducer elements were polarized at temperatures below the transformation point temperature and are not alleged by plaintiffs to infringe Gray method claims 11, 12, and 15, or article claim 3. The evidence as to the orientation of the crystals in the accused Gulton transducer elements is not sufficient to warrant a positive finding that said crystals are oriented in the specific directions set forth in Gray patent claims 3–7 inclusive. Claims 1 and 2 of the Gray patent in suit were infringed by transducers made by Gulton for defendant's use.

21. Defendant contends that plaintiff's infringement proofs show that defendant's transducer material is a *solid solution* rather than a homogeneous barium titanate. Claim 7 in suit specifically

recites a ceramic having as an active ingredient a *solid solution* of barium titanate. The other claims in suit are not specifically restricted to either a solid solution or a homogeneous barium titanate.

22. Summarizing the above findings on the issue of infringement, claims 1, 2, 11, 12, and 15 of the Gray patent have been infringed by transducers made by Centralab Division of Globe-Union, Inc., for defendant; claims 1 and 2 of the Gray patent have been infringed by transducers made by Gulton Manufacturing Company for defendant, but the evidence is inconclusive as to whether claims 3, 4, 5, 6, and 7 of the Gray patent have been infringed by defendant.

Validity Issue.

23. In the absence of any finding that claims 3, 4, 5, 6, and 7 have been infringed by defendant, the validity issue may be confined to claims 1, 2, 11, 12, and 15 of the Gray patent in suit. Only these latter claims are found to have been infringed by defendant. The Gray patent resulted from an application for patent filed in the United States Patent Office on September 20, 1946. Plaintiffs contend that the invention defined in the Gray patent was successfully reduced to practice prior to November 21, 1945, by the operation of a phonograph pickup device and by engineering tests.

24. Defendant has contended that all the patent claims in suit are invalid in view of prior patents and publications, and in view of prior knowledge by others. At the trial, defendant offered copies of the following patents and publications:

*"Patents*

Meissner, 1,886,234, November 1, 1932.

Gerlach, 2,231,159, February 11, 1941.

Thurnauer et al., 2,429,588 (filed October 2, 1941), October 21, 1947.

Wainer, 2,452,532 (filed November 2, 1943), October 26, 1948.

Wainer, 2,467,169 (filed November 12, 1942), April 12, 1949.

Cherry, 2,538,554 (filed August 22, 1947), January 16, 1951.

Crownover et al., 2,769,867 (filed September 9, 1947), November 6, 1956.

*Publications*

Heaviside—Electrical Papers, pp. 428, 429, 488–493 inclusive, published 1925.

Wood—A Textbook of Sound, pp. 146–155 inclusive, copyright 1930.

Brain—Piezo-Electric Effects with Dielectrics, Part VI, Investigations of Piezo-Electric Effects with Dielectrics, pp. 81–93 inclusive, published in 1924.

Schubnikov—Piezoelectric Textures, pp. 181–183 inclusive, published in Competes Rendus (Doklady) de l'Académie des Sciences de l'URSS, Vol. XLV, No. 5, in 1944.

Adams—On Electrets, pp. 469–486 inclusive, Bartol Research Foundation, Communication No. 16, published in Journal of The Franklin Institute, Vol. 204, July–December 1927.

Gross—Experiments on Electrets, pp. 26–28 inclusive, published in Physical Review, Vol. 66, Numbers 1 and 2, July 1 and 15, 1944.

Ginsburg—On Dielectric Properties of Ferroelectric [seignette electric] Crystals and of Barium Titanate, pp. 739–749 inclusive, in Russian Journal of Experimental and Theoretical Physics, Vol. 15, Number 12. [Parties have stipulated that the date of publication of this article shall be deemed to have been December 31, 1945]. The article also is found in Journal of Physics, Vol. X, No. 2, pp. 107–115 inclusive, in 1946.

von Hippel et al.—Titania Ceramics II, pp. 1–38 inclusive, Report No. 540, National Defense Research Committee, Division 14, dated October 1945 and declassified Open on January 8, 1946.

Mueller—Properties of Rochelle Salt, pp. 829–839 inclusive, Physical Review, Vol. 57, 1940.

Baker et al.—Dielectrics, The Dielectric Anomalies of Rochelle Salt by Hans Mueller, pp. 321–356 inclusive, in Annals of the New York Academy of Sciences, Vol. XL, Art. 5, December 31, 1940.

Valasek—Piezo-Electric Activity of Rochelle Salt under Various Conditions, pp. 478–491 inclusive, The Physical Review, Vol. XIX, Series II, 1922.

Wooster—A Text-Book on Crystal Physics, pp. 122–127 inclusive, Cambridge University Press, 1938.

Busch—New 'Rochelle-Electric,' p. 782, item 3369, Science Abstracts, Vol. XLI–A–1938.

Busch—New dielectrics of the Rochelle salt type, column 6518 in 2–General and Physical Chemistry, 1938.

Report No. 8—The Titanium Alloy Manufacturing Company, Electrical Testing Laboratory, Industrial Chemical Division, pp. 1–14 inclusive, Wainer and Salomon, September 17, 1942, publication date unknown.

Megaw—Crystal Structure of Barium Titanate, pp. 484 and 485, Nature, Vol. 155, April 21, 1945.

Mikola—Über die permanente Polarisation der festen Dielektrica (On the Permanent Polarization of Solid Dielectrics), pp. 476–489 inclusive, Zeitschrift Für Physik, Vol. 32, No. 6, published in Germany, 1925."

25. Defendant asserts that the above items represent a part of the prior art applicable to the barium titanate field and that any one of several of these items fully anticipates the Gray patent. The disclosure and teaching of each of these items are set forth hereinafter. The patents and publications will be described chronologically.

26. The article "Electrization and Electrification" in "Electrical Papers", written by Oliver Heaviside about 1885 and republished in 1925, discloses early theory as to the action of electric fields on dielectric materials. The general theory disclosed in the article does not mention barium titanate ceramics or piezo-electricity, and is not applicable thereto.

27. The article "Piezo-Electric Activity of Rochelle Salt under Various Conditions", by Valasek, published in 1922, describes ferroelectric theories and experiments with Rochelle salt. It does not mention barium titanate or its polarization.

28. The article "Piezo-Electric Effects with Dielectrics," by Brain, published in 1924, reported certain experiments with ebonite, glass, rubber, etc. It does not mention barium titanate.

29. The article "Permanent Polarization of Solid Dielectrics," by Mikola, published in Germany in 1925, reports investigations in polarization by various methods and using plates of glass, paraffin, mica, etc. The article does not mention barium titanate ceramics.

30. The article "Electrets", by Adams, published in 1927, reports his theories on the decay of polarization in electrets formed of wax mixtures. It does not mention barium titanate.

31. The article "Piezo Electricity", by Wood, copyrighted in 1930, relates generally to crystals such as quartz, tourmaline, and Rochelle salt. The article does not mention polarized barium titanate ceramics.

32. The Meissner patent 1,886,234, issued in 1932, discloses a method of making piezoelectric materials in which finely divided or powdered dielectric material, such as quartz, is subjected to the action of an electric field to orient or line up individual particles in a suitable binder, such as paraffin wax. In the Meissner method, heat or pressure may be applied to form a homogeneous layer. This Meissner patent does not mention barium titanate nor does it teach one skilled in the transducer art that ceramic

barium titanate can be polarized to produce a useful piezoelectric material.

33. Gerlach patent 2,231,159, application filed in 1937, discloses the formation of a piezoelectric microphone element by freezing a rubber solution in an electric field. Barium titanate ceramics are not mentioned in this patent.

34. The abstract of the article "New 'Rochelle-Electrics' ", by Busch, published in Science Abstracts in 1938, does not mention barium titanate. The abstract of the article "New Dielectrics of the Rochelle Salt Type", by Busch, published in General and Physical Chemistry in 1938, likewise does not mention barium titanate. Both of these items are abstracts of the full Busch publication noted by the Patent Office examiner in one of his official actions on the Gray application for patent.

35. The article by Wooster in "A Text-Book on Crystal Physics", published in 1938, discusses the dieletric properties of crystals and Rochelle salt, but does not mention barium titanate or its polarization.

36. The article "Properties of Rochelle Salt", by Mueller, published in May 1940, discusses various theories concerning the properties of Rochelle salt. This article does not mention barium titanate or its polarization.

37. The 35-page article, "The Dielectric Anomalies of Rochelle Salt," also by Mueller, published in late 1940, likewise does not mention barium titanate or its polarization.

38. Thurnauer et al. patent 2,429,588, for which application was filed October 2, 1941, merely discloses the use of barium titanate together with titanium dioxide and a flux to form electrical insulating materials.

39. The report entitled "Report No. 8, the Titanium Alloy Manufacturing Company," signed by Eugene Wainer and Allen M. Salomon on September 17, 1942, describes research at the Titanium Alloy Manufacturing Company's Electrical Research Laboratory with titania ceramics in efforts to provide a substitute for condenser-grade mica insulation. The effective date of Report No. 8 as a publication is uncertain. There is evidence that a copy of Report No. 8 was mailed by Titanium Alloy Manufacturing Company to plaintiff Erie Resistor Corporation about November 7, 1942, and that a security classification was imposed upon said report at a later date. There is no evidence as to the date upon which said report was declassified or as to the date upon which the report became a publication. Report No. 8 describes many compositions and suggests that one group *may* exhibit properties suitable for electromechanical devices. The report emphasizes that it is of an introductory nature and that further reports would be forthcoming. Some of the compositions mentioned in this report include barium titanate but always in combination with strontium titanate. The report states that it appears that the compositions will not polarize in an electric field. Defendant's expert stated that Dr. Wainer did not teach how to polarize polycrystalline barium titanate ceramics. Report No. 8 does not teach one skilled in the transducer art that ceramic barium titanate can be polarized to produce a useful piezoelectric material.

40. Wainer patent 2,467,169, application filed November 12, 1942, discloses ceramic dielectric materials comprising admixtures of barium titanate and strontium titanate. The specification of this Wainer patent states in part:

" * * * The controlling factors in the formation of the present bodies are the presence of more than one titanate and the substantial absence of free rutile, $TiO_2$, in the final product.

* * * * * *

" * * * Application of the materials disclosed herein in the fields of pyroelectricity and supersonics is indicated and its use in the construction of crystal or condenser microphones, frequency stabilizers, amplifiers, phonograph pickups and oscillators generally will be found highly advantageous. Some of the

members of the foregoing groups exhibit the electrical and mechanical characteristics of piezoelectric and pyroelectric crystals."

The Wainer application for this patent is noted in Wainer patent 2,402,515, noted and considered by the Patent Office examiner in one of his official actions on the Gray application for patent. Wainer patent 2,467,169 does not teach that a polycrystalline barium titanate ceramic may be polarized to produce a useful piezoelectrical material.

41. Wainer patent 2,452,532, application filed November 2, 1943, discloses dielectric compositions containing mixtures of alkaline earth titanates, an alkaline earth stannate, and an alkaline earth zirconate. This Wainer patent teaches that a ceramic dielectric containing barium titanate, barium stannate, and barium zirconate may be useful for by-pass filter and power pack condensers. This Wainer patent is mentioned in Wainer patent 2,402,515, which was noted and considered by the Patent Office examiner in one of his official actions on the Gray application for patent. Wainer patent 2,452,532 does not teach that a barium titanate ceramic can be polarized to produce a useful piezoelectric material. These Wainer patents relate to dielectric compositions as substitutes for paper, mica, etc., in condensers.

42. The article "Electrets," by Gross, published in 1944, is a preliminary report on the influence of temperature on dielectric absorption of carnuba wax. The article does not mention barium titanate.

43. The article "Piezoelectric Textures," by Schubnikov, published in 1944, reports Russian experimental work in the preparation of piezoelectric elements by *brushing* crystals of Rochelle salt. The article does not mention barium titanate or the use of a polarizing electric field.

44. The article "Crystal Structure of Barium Titanate," by Megaw, published April 21, 1945, states that no detailed work on barium titanate had theretofore been published, and that the Megaw investigations determined that the crystal structure of barium titanate is tetragonal and that it is cubic at 200° Centigrade. The Megaw article does not teach that a polycrystalline barium titanate ceramic may be polarized to produce a useful piezoelectric material.

45. The article "Dielectric Properties of Ferroelectric (Rochelle-Electric) Crystals and Barium Titanate," by V. L. Ginsburg, was first published in the Russian language on some uncertain date which plaintiffs and defendant have stipulated shall be deemed to have been December 31, 1945. A translation of this article was published in the Journal of Physics in 1946. The Ginsburg article discloses detailed theory for and describes the properties of Rochelle salt. The concluding portion of the Ginsburg article theorizes concerning the dielectric properties of polycrystalline barium titanate, and states:

" * * * All these problems need a more detailed experimental investigation.

    *    *    *    *    *    *

" * * * In distinction to other ferroelectric crystals in barium titanate piezoelectric phenomena are impossible above the Curie point. Therefore, in $BaTiO_3$, the Curie point is simultaneously the transition point of a nonpiezoelectric state into a piezoelectric one. Of course, there might occur a transition of a nonpiezocrystal into a piezocrystal not associated with the appearance of a pyromoment. We shall not undertake to develop the theory of this case. * * * "

The above quotations are from the translation of the Ginsburg article in the 1946 Journal of Physics. The 1946 translation is noted in a footnote contained in a published article by one H. L. Donley whose article was noted by the Patent Office examiner in one of his official actions on the Gray application for patent. The Ginsburg article does not teach one skilled in the transducer art that a barium titanate ceramic can be polarized to

produce a useful piezolectric material. There is no satisfactory evidence that Ginsburg ever polarized BaTiO₃ ceramic.

46. In response to letters rogatory, requested by defendant, transmitted from this court to the Moscow City Court, V. L. Ginsburg on July 25, 1958, stated that he was not the author or co-author of any work appearing in a printed publication bearing a publication date prior or subsequent to September 20, 1946, which describes the making of a useful transducer from polycrystalline barium titanate which had been fired to ceramic firing temperatures, electroded, and caused to become piezoelectric as a result of being permanently polarized by having D.C. voltage applied to its electrodes. In response to the same letters rogatory, one B. M. Vul, a Russian mentioned in the Ginsburg article stated that he, Vul, was the author or coauthor of an article first published in June 1949 by A. V. Rzhanov, describing the making of useful transducers from polycrystalline barium titanate.

47. The report "Titania Ceramics II," by von Hippel, et al., submitted by the Massachusetts Institute of Technology to defendant's National Defense Research Committee, was declassified from *restricted* to *open* on January 8, 1946. The evidence is inconclusive as to the actual date of publication of this report. This report discusses research on titanium dioxide and barium titanate ceramics and a study of the dielectric properties of such ceramics. The report describes machinery for extruding titanium dioxide in sheet form for use in capacitors. The report also describes research on titanium dioxide resistors designated semi-conductors. This report does not teach that a barium titanate ceramic can be polarized to produce a useful piezoelectric material.

48. Cherry patent 2,538,554, application filed August 22, 1947, relates to a process for producing piezoelectric transducers, but is too late in date to be relevant to the issue of validity of the Gray patent claims.

49. Crownover, et al. patent 2,769,-867, for which application was filed September 9, 1947, is also too late in date to be relevant to the issue of validity of the Gray patent claims. The Gray patent in suit was in fact cited against the Crownover application for patent. An apparently abandoned and earlier patent application, of which patent 2,769,867 purports to be a continuation-in-part, was not produced at the trial.

50. Unpolarized barium titanate as a chemical substance was known prior to any date that can be accorded Gray's discovery that barium titanate could be polarized to produce a useful piezoelectric material. Thurnauer et al. patent No. 2,429,588, application for patent filed October 2, 1941, discloses ceramic materials containing barium titanate for use as an insulating material in condensers. This patent does not disclose that barium titanate ceramics can be piezoelectric nor that such ceramics can be polarized to produce a useful transducer. In 1941, Thurnauer, then director of research of American Lava Corporation, sent samples of barium titanate to plaintiff Erie Resistor Corporation. These samples were tested by Erie to determine their insulating characteristics in condensers. Gray, an employee of Erie, participated in the testing of such samples of barium titanate.

51. Defendant asserts that the piezoelectric property of barium titanate was known by various engineers during the early years of World War II preceding the filing of the Gray application for letters patent on September 20, 1946, and asserts that such persons recognized the need for polarization of the barium titanate material. Defendant contends that such facts were known or discovered by:

Kristian H. Brandt
Glenn N. Howatt
Carl A. Wiley
Eugene Wainer
Joseph W. Crownover
Herman W. Koren

The evidence is this case does not support a finding that any of the specified engineers or inventors knew of or successfully reduced to practice a useful transducer made of polarized barium titanate prior to the date on which Gray first produced and successfully tested a barium titanate transducer.

52. Kristian H. Brandt, a civilian employee of defendant's Signal Corps Engineering Laboratory, Fort Monmouth, N.J., from 1941 to 1955, was concerned in 1943 with radio insulating materials including dielectrics containing barium titanate. He testified that he noticed some unusual properties which he set forth in his memorandum on titanate ceramic bodies dated February 23, 1943. This particular memorandum was classified "confidential" by defendant until September 9, 1957, a date subsequent to the commencement of the trial in this case. The memorandum dated February 23, 1943, states in part:

"12. A capacitor was made from a rod whose length was several times its diameter. Suitable electrodes were placed on each end, and the rod subjected to vibration. The presence of an EMF on the electrodes became evident and while it is believed such EMF was the result of the vibratory stimulus, it might have resulted from retention of an EMF from some previous experiment. It [sic] the latter is true, the body gave evidence of exceptional electrical memory. If the EMF resulted from the vibration, it is the same phenomena observed in Quartz and Rochelle Salt crystals when they are subjected to vibratory stimuli. Due to its relative higher mechanical strength and freedom from all effects of temperature variation as well as its unlimited artificial source which can be controlled, the development of hydroscopic microphones and other subaqueous detectors can be developed where simplicity of design and great strength are of prime importance."

The materials mentioned in this Brandt memorandum are mixtures containing substantial proportions of barium titanate and strontium titanate together with various other oxides. Taken in its entirety, the descriptive matter in this Brandt memorandum does not support defendant's contention that Brandt then recognized or knew that an application of a large direct current voltage would cause barium titanate to become piezoelectric. A later Signal Corps laboratory memorandum for file dated October 27, 1943, written by Herbert S. Lyon and approved by Brandt, states in part:

"* * * Special formulations of the titanates developed many unusual performance properties which can be utilized in many special applications.

* * * * * *

B–4. PIEZO electric effect. This property usually found only in crystals was present and may find application in submarine microphones and listening devices and similar subsurface detection work. * *"

This Lyon-Brandt memorandum for file does not use the terms barium or polarization. This memorandum does not support defendant's contention that Brandt then knew how to polarize barium titanate to produce a useful transducer. The activities of Brandt at the defendant's Signal Corps laboratories during the war years were concerned primarily with the development of titanate insulating materials as a substitute for mica, then in short supply. Brandt did not make a successful transducer of polarized barium titanate prior to Gray.

53. As technical representative of defendant's Signal Corps on a contract defendant made with Gulton Manufacturing Company, Brandt made no protest whatsoever that his invention was being appropriated when Glenn N. Howatt of Gulton filed a patent application on May 29, 1948, disclosing the use of direct current voltages to polarize barium titanate to produce a piezoelectric transducer element. The Howatt patent application file includes an affidavit made

by Howatt in 1950 stating that he completed the invention in April 1945, at the Signal Corps laboratory, Fort Monmouth. Howatt testified in the present case in 1957 that his work done at Fort Monmouth in 1945 was at that time discredited and that he "didn't know at that time what I did." Brandt was familiar with the work done by Howatt at Fort Monmouth and done by Gulton Manufacturing Company in connection with the production of thin films of barium titanate ceramics, but Brandt then had no knowledge that barium titanate could be polarized to produce useful piezoelectric properties and did not produce a barium titanate transducer. Frank H. Priebe, also a civilian employee of defendant at the Signal Corps laboratory, Fort Monmouth, from 1939 to date and acquainted with Brandt since 1940, in 1943 tested sample condensers having barium titanate in the insulation and noted the erratic behavior of some condensers. Priebe was told by Brandt about some probably piezoelectric phenomena, but the evidence does not show that Brandt or Priebe knew in 1943 how to polarize barium titanate to produce a piezoelectric material nor does it show that either ever produced a successful transducer having as an action ingredient polarized barium titanate. Brandt testified as to dielectric strength tests in which the dielectric material was submerged in carbon tetrachloride and various voltages applied, that the liquid vibrated, and that the dielectric broke down and failed. Such a breakdown test of a dielectric was not a successful reduction to practice of a useful transducer.

54. Glenn H. Howatt was a military officer assigned to duty at defendant's Signal Corps laboratory, Fort Monmouth, during the 1944–1946 period, and later became an officer of Gulton Manufacturing Company, now a subsidiary of Gulton Industries. At defendant's laboratory, Howatt was concerned with developing a doctor blade machine for forming thin sheets of ceramic dielectric material. The machine was sent from Fort Monmouth to the Massachusetts Institute of Technology for further testing under government contract. At the trial, Howatt testified that neither Brandt nor Priebe, both mentioned in finding 53, told him that barium titanate had to be polarized in order to make it piezoelectric. Three years later, on May 29, 1948, Howatt filed an application for patent in which Howatt disclosed the use of direct current voltages to polarize barium titanate to produce piezoelectric transducer elements. The Howatt application was filed some 20 months after the Gray application for patent was filed in the Patent Office. Howatt's affidavit made in 1950 and contained in his patent application file avers that Howatt made his alleged invention in 1945. Howatt testified in the present suit in 1957 as follows:

"Q. There is one question which bothers me. The Sixth Quarterly Report that you wrote in late 1947. You claimed that you had discovered this piezoelectric effect in April 1946. Will you explain why you would make that claim in 1947 and a 1945 claim at a later date? A. My work in 1945 at Fort Monmouth was, in my opinion, at that time discredited. I didn't know at that time what I did. Doctor von Hippel said it was impossible."

Said Sixth Quarterly Report, dated August 22 to November 21, 1947, relating to the development of thin sheet titanium base capacitors by Gulton for defendant under a government contract, states in part as follows:

"Q. *Experiments on Piezo-Electricity.*

"1. *History and Present Accomplishments.*

"During April of 1946, while testing body No. 71 under D.C. and A.C. potentials for breakdown, an audible buzz was noticed. The equipment was checked and it was finally found that the sample, after having been tested under D.C., was vibrating under A.C. Thus, a way to make a ceramic piezo-electric was found.

At the present state of the art, no theoretical explanation of this effect can be substantiated.

"This phenomenon opens entirely new horizons in the production of vibration instruments hitherto impossible. The full extent of the application of this material will require further research and development.

"Thin sheet ceramic techniques, for which the Government has licenses under our Patent Applications, make it possible to take full advantage of this phenomenon due to the fact that close control can be maintained on the plate thickness and a denser, mechanically stronger material is fabricated. Therefore, closer tolerances can be maintained and greater mechanical and electrical stresses can be exploited without damage to the specimens.

"The material is applicable to the general field of transducers, utilizing piezo-electric effect. Furthermore, the materials exhibit a large piezo-electric effect permitting a further use of the material as a signal transducer not utilizing the piezo-electric effect. Specifically, the fields of application are microphones, forms of dynamic strain gauges, hydrophones, pressure gauges including accelerometers, piezometers, seismometers, etc., electrostatic galvanometers, sonic and supersonic transmitters and receivers, crystal frequency control equipment, and band path or band rejection filters."

The evidence does not show that Howatt ever produced a successful transducer having as an active ingredient polarized barium titanate prior to the date on which Gray first produced and successfully tested a barium titanate transducer. As of January 1, 1955, Gulton Manufacturing Corporation and Glenco Corporation, with which Howatt was associated, executed license agreements with plaintiff Clevite Corporation, obtaining certain rights to manufacture and sell transducers and transducer elements under the Gray patent here in suit for stated royalty rates.

55. During May 1945, defendant's Signal Corps proposed research projects for the Insulation Laboratory of Massachusetts Institute of Technology to develop ceramic materials for radio interference suppression condensers, ceramic materials for resistance devices for spark plugs, *and ceramic materials having piezoelectric properties*. Howatt and Brandt were consulted on this proposed research program and neither disclosed then that he knew how to polarize barium titanate ceramics. A report of this research published in 1950, written by A. von Hippel of the M.I.T. Laboratory, summarizes research on barium titanate and indicates surprise that a biasing field transformed a barium titanate disc into a piezoelectric resonator having a piezoelectric response without the field because of the remanence of the polarization. The research program to develop ceramic materials having piezoelectric properties indicates that Brandt and Howatt at Forth Monmouth did not have knowledge in April 1945 on how to polarize barium titanate ceramics to produce a useful transducer.

56. Carl A. Wiley, a civilian employee of defendant's Signal Service Aircraft Radio Laboratory, Dayton, Ohio, in September 1942 tested commercial barium titanate condensers to measure their electrostrictive coefficient. From this condenser testing, Wiley evolved some theories based upon a ferroelectric-ferromagnetic analogy. Wiley did not succeed in demonstrating any piezoelectric property in barium titanate. The electrostrictive effects observed by Wiley were the effects of an applied biasing voltage, whereas the piezoelectric effect utilized by Gray is independent of a biasing voltage. An electrostrictive material has no inherent ability to develop a voltage when subjected to pressure or vibration. It is necessary to apply a bias voltage to the electrostrictive material and then a voltage developed by applied

pressure depends upon the bias voltage. Polarized barium titanate does not require a bias voltage in order to develop a voltage from mechanical pressure. Wiley did not produce a successful transducer having as an active ingredient polarized barium titanate prior to the filing date of the Gray application for patent.

57. Eugene Wainer supplied information to defendant's counsel in the present suit but was not called as a witness. Wainer had early contact with barium titanate and did extensive research in the laboratories of Titanium Alloys Manufacturing Company, a source of supply for the commercial barium titanate used as a dielectric material in condensers as early as 1942. Wainer is an inventor and a writer of scientific articles. One of the Wainer patents and one of his published articles were considered by the Patent Office examiner and cited in the Gray patent application file. As noted in findings 40 and 41, the several early Wainer patents relate to dielectric compositions containing barium titanates to be utilized as substitutes for paper, mica, etc., in condensers. These patents do not teach that barium titanate may be polarized to produce a useful piezoelectric material. As noted in finding 39, Report No. 8 of the Titanium Alloys Manufacturing Company, coauthored by Wainer, indicates that titanate compositions will not polarize in an electric field. The documentary evidence with respect to Wainer does not teach how to polarize barium titanate ceramics. The evidence in this case is insufficient to prove that Wainer had knowledge of polarized barium titanate ceramics or that Wainer produced a successful transducer having as an active ingredient polarized barium titanate prior to the filing date of the Gray application for patent. While Wainer's early disclosures mention possible utility of barium titanate in piezoelectricity, etc., his later article and correspondence either make no reference to piezoelectricity or state that piezoelectricity in barium titanate would have to wait for single crystals to be available.

58. Joseph W. Crownover and Herman W. Koren did not testify during the trial of this suit. Defendant's contention that said persons observed the piezoelectric property of polarized barium titanate and recognized the need for polarization of the material at some date prior to the filing of the Gray application for patent has not been proved. Crownover and Koren patent No. 2,769,867, application filed September 9, 1947, a date nearly one year subsequent to the date of the Gray application, refers to an earlier Crownover and Koren application said to have been filed August 31, 1946, a date three weeks prior to the Gray application date. A copy of said earlier Crownover and Koren application has not been produced and presumably said application became abandoned. Without a copy of said earlier Crownover and Koren application and without testimony, the state of their knowledge on the subject matter in suit as of any date prior to September 20, 1946, remains unknown.

59. The evidence shows that Gray made tests of barium titanate materials for condenser insulation at Erie Resistor Corporation as early as November 3, 1941; that Gray knew of or recognized the piezoelectric property of barium titanate at least as early as July 19, 1943, and further that Gray made one or more transducers in the form of a phonograph pickup device embodying the invention claimed in his patent here in suit and successfully tested and operated such a transducer as early as November 21, 1945, and again prior to June 14, 1946. Gray disclosed his invention to patent counsel on July 19, 1946, who diligently prepared the patent application filed September 20, 1946, on which the patent in suit was issued. Defendant placed certain work on barium titanate under a security classification as early as April 1943, and Gray was granted clearance.

60. Plaintiff Erie Resistor Corporation on April 25, 1944, entered into a supply contract with defendant to fur-

nish condensers made in accordance with defendant's Fort Monmouth Signal Laboratory specifications. There was an allowance for test apparatus. Defendant made loans to Erie for plant expansion. The supply contract and the changes made therein included a standard patent clause but never required or paid for any research and development in the transducer field. The contract and loan did not give defendant any royalty free licenses on inventions in the transducer field.

61. Gray patent claims 1, 2, 11, 12, and 15, found to have been infringed by defendant, as set forth in finding 22, are not invalid nor anticipated by any of the numerous prior patents and publications asserted by defendant and listed in finding 24, nor by any prior knowledge of any of the several persons named by defendant and listed in finding 51. The petition herein averring unlicensed and infringing use of the Gray invention defined in Gray patent claims 1 and 2 was filed April 2, 1956, and the averment as to method claims 11, 12, and 15 was made as of July 8, 1957, the date of filing of plaintiffs' amendment to petition.

62. Summarizing the above findings, it is found that the inventions of claims 1, 2, 11, 12, and 15 of Gray patent No. 2,486,560 have been used or manufactured by or for the defendant without license of the patent owner, and further that said patent claims are valid over the prior patents, publications, and knowledge asserted by defendant. Since no finding as to defendant's use of the inventions defined in Gray patent claims 3, 4, 5, 6, and 7 has been made, no finding as to the validity of these particular claims is made herein.

### Conclusion Of Law.

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1, 2, 11, 12, and 15 of Gray patent No. 2,486,560 are valid, that the inventions covered by said patent claims were used by defendant without authorization of the patent owner, and

that plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use, and judgment will be entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c).