or any part of the work is for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract or by his failure to act within the time specified in the contract (or if no time is specified within a reasonable time), an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing accordingly. No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted. No claim under this clause shall be allowed (i) for any costs incurred more than 20 days, before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has been issued), and (ii) unless the claim in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption but not later than the date of final payment under the contract. Any dispute concerning a question of fact arising under this clause shall be subject to the dispute clause. (ASPR 7–602.46).

**LEESONA CORPORATION**

v.

**The UNITED STATES.**

**No. 130–70.**

United States Court of Claims.

Jan. 28, 1976.

Alfred W. Breiner, Arlington, Va., atty. of record, for plaintiff. Robert F. Conrad and Breiner, Ramik & Brown, Arlington, Va., of counsel.

A. David Spevack, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant. W. Boswell Childs, Arlington, Va., of counsel.

Before SKELTON, NICHOLS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on exceptions by the parties to the recom-mended decision filed February 27, 1975, by former Trial Judge Hal D. Cooper (since resigned), pursuant to Rule 134(h), having been considered on the briefs and oral argument of counsel. Since the court agrees with the trial judge's rec-ommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. It is therefore concluded: (a) that claims re Patent No. 3,419,900 (claims 4 and 7), Patent No. 3,276,909 (claim 9) and Patent No. 3,436,270 (claims 1, 2, 3, 5–8, 10, 16 and 17) are valid and infringed and defendant has no license thereunder; (b) claims re Patent No. 3,436,270 (claim 19), Patent No. 3,553,024 (claims 1, 3, 4, 6 and 11) and Patent No. 3,378,406 (claims 1, 3, 8 and 9) are invalid; (c) claims 12, 15 and 16 of Patent No. 3,438,815 are not infringed by defendant; and (d) defendant is licensed under claims 1, 2, 3, 8 and 9 of Patent No. 3,531,327. Accordingly, plaintiff is entitled to recover reasonable and entire compensation in accordance with this opinion and judgment is entered for plaintiff therefor, the extent of which will be determined in further proceed-ings pursuant to Rule 131.

## OPINION OF TRIAL JUDGE

COOPER, *Trial Judge:*

Contending that seven of its patents have been infringed, plaintiff seeks rea-sonable and entire compensation under 28 U.S.C. § 1498 for defendant's procure-ment of a metal/air battery designated the BB–626( )/U. Defendant presents its usual array of defenses, attacking va-lidity of each patent on a multiplicity of grounds, asserting there is no infringe-ment of most of the patents, and alleg-ing a license running to defendant under all of the patents.

For the reasons hereinafter stated, it is concluded that the claims at issue in patents Nos. 3,276,909, 3,419,900, and 3,436,270 (except claim 19) are valid and infringed, and that defendant has no license thereunder. It is further con-cluded that the claims at issue in patents Nos. 3,553,024 and 3,378,406, and claim 19 in No. 3,436,270 are invalid; that pat-

ent No. 3,438,815 is not infringed; and that patent No. 3,531,327 is subject to a license to defendant.

The subject matter in this case pertains to batteries or, stated in more technical terms, electrochemical devices for producing electrical energy through chemical processes. These devices employ a pair of electrodes (an anode and a cathode), a fuel to be consumed, and an electrolyte as essential components in the production of electrical energy. In some batteries, flashlight batteries being but one example, all reactants, including the fuel which is a metal that is a part of one of the electrodes, are contained in the battery package. In other more sophisticated types of batteries (sometimes called fuel cells),[1] the reactants, including the fuel which may be a gas such as hydrogen, are supplied continuously from an external source. In either case, it is the chemical process of fuel oxidation that produces the electrons for the current in an external circuit.

The fuel cell type of battery is usually distinguished from other batteries in that the fuel cell electrode is merely a situs for the chemical reaction and is not consumed by that reaction. As a result, the useful life of a fuel cell is not normally measured in terms of its electrode life. The more conventional batteries, on the other hand, are designed to have one or both of the electrodes take an active part in the reaction so that at least one of the electrodes is consumed by the reaction. When the electrode is consumed, either the battery is thrown away or it is electrically recharged. Historically, throwaway batteries have been known as "primary" batteries while the rechargeable type has been designated a "secondary" battery.

The metal/air batteries accused to infringe are a hybrid. As with conventional batteries, the anode of a metal/air battery contains the fuel and is consumed by the chemical reaction. The cathode, however, is not consumable and, as in a fuel cell, the reactant, oxygen, is supplied from the ambient air on a continuous basis. Further, although the battery is not electrically rechargeable and, hence, is of the primary type, it is designed for rapid mechanical replacement of the consumed electrode so it is considered to be *mechanically* rechargeable.

Of the patents in suit, the '909, '900, '815, and '024 patents are concerned with electrode structures. The '270, '406, and '327 patents are directed to a metal/air battery configuration and the mechanical rechargeability of that battery.

*Elmore and Tanner Patent No. 3,419,900*

This patent discloses an electrode structure comprising a catalytic layer made from a uniform admixture of a fluorocarbon polymer and a catalytic metal powder. The fluorocarbon is preferably polytetrafluoroethylene (sometimes referred to either as PTFE or by du Pont's trademark Teflon). This mixture is carried by a suitable current collector such as a silver screen or a porous carbon block with the electrolyte being on one side of the catalytic layer and a gaseous reactant on the other.

Claim 4, the only independent claim asserted to be infringed,[2] is as follows:

An electrochemical cell for the direct generation of electrical energy comprising an anode, a cathode, and an electrolyte, said electrochemical cell being constructed and arranged to provide a space between said anode and cathode and said space containing said electrolyte, at least one of said anode

---

1. There is much confusion in the use of the terms "fuel cells" and "batteries." Battery is used, in a loose sense, as a name for a wide variety of different types of electrochemical devices. It is used to denote a plurality of cells, yet it is also used when referring to a single cell, e. g., a flashlight "battery." Fuel cells are a part of the general "battery" field and a plurality of fuel cells are commonly re-

ferred to as a battery; however, the term "fuel cell" normally refers to a particular type of electrochemical device. (Findings 3, 4.)

2. Claim 7, also asserted to be infringed, provides:

"The electrochemical cell of claim 4 wherein the fluorocarbon polymer is polytetrafluoroethylene."

and cathode being a nonconsumable, gas-consuming electrode comprising a catalytic layer containing a substantially uniform admixture of metal containing electrocatalyst particles and a fluorocarbon polymer, said catalytic layer being exposed to the electrolyte of the cell and having a porosity sufficient to permit diffusion of gases into said catalytic layer.

All of the elements of the claim are concededly old except for the use of "a substantially uniform admixture of metal containing electrocatalyst particles and a fluorocarbon polymer" as a catalytic layer. The evidence is that Elmore and Tanner were the first to use this combination of materials in an electrode for an electrochemical cell.

At the outset, defendant contends that the specification is defective within the meaning of 35 U.S.C. § 112 because it does not specify the critical ratio of the catalyst to the fluorocarbon. Although defendant is correct that precise recipes are not set out in the specification, a patent is directed to those skilled in the art and need only be in sufficient detail to enable them to practice the invention. *Trio Process Corp. v. L. Goldstein's Sons,* 461 F.2d 66, 74 (3d Cir. 1972), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262; *Gray Co. v. Spee-Flo Manufacturing Corp.,* 361 F.2d 489, 493 (5th Cir. 1966). That requirement is satisfied here for it is clear from the evidence that a very wide range of ratios may be employed, depending on the particular desired use. The basic controlling consideration, as those in the art would readily recognize, is that an excess of polymer will adversely affect conductivity. As to specific ratios, the testimony of plaintiff's witnesses, Dr. Frysinger and Dr. Giner, and defendant's witnesses, Dr. Weissman and Mr. Moran, establishes that one of ordinary skill in the art would have no difficulty at all in selecting workable proportions in light of the patent disclosure.

Defendant next contends that the combination of claim 4 is anticipated by Niedrach et al Patent No. 3,297,484. This defense is premised on the contention that claim 4 is not entitled to the original filing date of March 4, 1960, but is entitled only to the December 22, 1966 date on which a continuation-in-part application was filed. Yet, each and every term of claim 4 is supported by, and was plainly disclosed in, the original application filed in 1960. Also from the time the first application was filed, Elmore and Tanner consistently presented claims to a new electrode composition consisting of a mixture of fluorocarbon and catalyst particles. In light of these facts, claim 4 is entitled to the filing date of March 4, 1960. *Pursche v. Atlas Scraper & Engineering Co.,* 300 F.2d 467 (9th Cir. 1961), *cert. denied,* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962); *Kollsman v. Ladd,* 226 F.Supp. 186 (D.D.C.1964). Since the Niedrach patent has a filing date of May 8, 1961, it is not a reference against this claim.[3]

The principal defense asserted by defendant is that of obviousness under 35 U.S.C. § 103. This defense requires consideration of the scope and content of the prior art in 1958 when Elmore and Tanner made their invention, and a determination of whether the differences between that art and the claims in issue would have been obvious to one of ordinary skill in the art. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Defendant relies mainly on Berl Patent No. 2,275,281, Winckler et al Patent No. 2,641,623, Witherspoon et al publication entitled *"The Oxygen Electrode,"*[4] and the argument that the use of Teflon was a mere substitution of one plastic for another.

In considering this defense, it is necessary to place the prior art in context. Prior to 1958, a major problem with air- or gas-breathing electrodes had been the

---

**3.** Nor are any of the other patents that have filing dates subsequent to March 4, 1960.

**4.** The parties are in disagreement whether the Witherspoon et al publication is properly a reference. Since the claims are considered to be valid even if Witherspoon is a reference, it has been unnecessary to resolve that issue.

need to develop an electrode that would be permeable to the gas, but not so porous as to permit the electrolyte to flood the pores of the electrode. In the sophisticated fuel cell, a partial solution was the use of a biporous electrode structure and balanced gas pressures. In the more common variety of battery, various wet-proofing techniques were employed to control electrode flooding. Of particular interest are the approaches described in the Berl and Winckler patents, as well as in Witherspoon, wherein a binder material having hydrophobic properties is dissolved and the solution is combined with particles of a suitable material such as activated carbon. The generally accepted view is that the prior art approach, using, for example, ethyl cellulose, resulted in the electrode particles being at least partially coated with the plastic material. This material inhibits wetting of the electrode particles by the electrolyte and tends to form a barrier beyond which the electrolyte cannot pass. Since gas does not pass through liquid in significant quantities, this barrier then defines a line along which the chemical interaction among the three phases, gas, liquid, and solid, takes place.

The differences between the claimed electrode and that prior art, in terms of structure, reside both in the use of a fluorocarbon as the binder material and in mixing particles of the fluorocarbon with particles of catalyst instead of coating the catalytic particles with a solution of the plastic binder material as is the case with Berl and Winckler.

The differences between the claimed electrode and the prior art, in terms of functional operation, were the subject of extended testimony at trial. Dr. Giner's "flooded agglomerate" theory (finding 12) suggests that the claimed combination would allow the electrolyte to wet all of the catalyst particles, while the Teflon particles would provide a path for the air to permeate the catalytic layer. This would permit the desired three-phase reaction to occur throughout the volume of catalytic material. Dr. Frysinger explained this as a "volume reaction" in which the entire volume of catalyst is utilized, as opposed to the "line reaction" of the prior art such as Berl and Winckler where the reaction takes place along a line defined by the gas-liquid interface.[5] Defendant's expert Dr. Gilman did not contest Dr. Giner's theory, but emphasized that it was only a theory; however, that theory has received acceptance in the industry and no opposing theories have been advanced.

The differences between the claimed electrode and the prior art, in terms of result, are not seriously in dispute. Teflon-bonded electrodes have demonstrated clear superiority in areas of energy and power density. Defendant's Dr. Gilman summed it up when he testified that everyone has gotten on the "bandwagon" of Teflon-bonded catalysts. This has included companies such as General Electric, American Cyanamid, and Pratt & Whitney.

Based on these differences in structure, function, and result, defendant's contention that the use of Teflon is a *mere* substitution of materials in the Berl and Winckler electrodes cannot be accepted. It ignores the fact that not only is the material not suggested by any prior art but that neither Berl nor Winckler suggests using binder particles in a mixture with catalyst particles. Thus, not only is a different material used, it is being used in a different form to produce a different structure, with significantly improved and unexpected results. Hence, more than a mere substitution is involved. *Carbide & Carbon Chemicals Corp. v. Coe,* 69 App.D.C. 372, 102 F.2d 236, 241 (1938); *Allen Filter Co. v. Star Metal Manufacturing Co.,* 40 F.2d 252 (3d Cir. 1930), *cert. denied,* 282 U.S. 848, 51 S.Ct. 27, 75 L.Ed. 752.

Defendant also contends that Teflon-bonded electrodes were simultaneously developed by a number of individuals and that this is further indicative of its obviousness. While that factor is sometimes considered as an indicia of obvious-

---

5. Defendant's contention that the chemical reaction is the same irrespective of where it occurs is, of course, correct but entirely beside the point.

ness, see, *e. g., Felburn v. New York Central R.R.,* 350 F.2d 416, 425–26 (6th Cir. 1965), *cert. denied,* 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966), the facts do not support such a conclusion here. Elmore and Tanner made their invention in mid-1958, well over a year before the work of anyone else in the field. The bulk of the publications on which defendant relies to establish the alleged simultaneous invention bear dates subsequent to Elmore's public disclosure of their work in May 1960. Moreover, Elmore and Tanner have been recognized by those in the field as being the first to work with Teflon-bonded electrodes.

In the final analysis, the "before and after" actions and judgments of those in the field, *Safety Car Heating & Lighting Co. v. General Electric Co.,* 155 F.2d 937, 939 (2d Cir. 1946), are the most persuasive evidence that the combination of claim 4 was an unobvious development. Before the invention, work was being done with plastic materials as binders for electrodes. Although Teflon was available, no one had suggested using that material, despite its well-known hydrophobic properties. After Teflon-bonded electrodes became known, virtually the entire industry shifted to it, even though no one understood why the electrode was so superior to the prior art. Since then, a great deal of research has been devoted to this electrode but, even now, only theories have been developed to explain its superior performance.

Under these circumstances, it is concluded that claims 4 and 7 are valid.

As to infringement, the BB–626( )/U is plainly an electrochemical cell for the direct generation of electrical energy. Defendant has stipulated that the cathode is a uniform admixture of Teflon and a catalyst. A case of infringement of claims 4 and 7 has been established.

■ Defendant's contention that 28 U.S.C. § 1498 bars this suit because Dr. Tanner was an employee of the United States at the time he executed the continuation-in-part application is without merit. Dr. Tanner was neither employed by nor in the service of defendant either when the invention of claims 4 and 7 was made in 1958 or when the original application was filed in 1960. Since the claims are entitled to the 1960 filing date, his subsequent employment history is irrelevant and the bar expressed in 28 U.S.C. § 1498 is inapplicable.

■ Finally, defendant contends that it is entitled to an "implied" license under this patent, pointing to a series of contracts commencing in March 1966 between the parties for the militarization and procurement of plaintiff's zinc/air battery, and to plaintiff's acquisition of the Elmore and Tanner patent application in June 1966. These facts, however, are insufficient to award defendant a license.

The Teflon-bonded electrodes of claims 4 and 7 were neither first conceived nor reduced to practice under any federally funded project, or under any contract with defendant. The work of Elmore and Tanner was financed by the Kettering Foundation, and plaintiff, which had been working with Teflon-bonded electrodes prior to 1966, had incorporated that type of electrode in its own privately funded zinc/air battery program prior to all of the contracts on which defendant relies. Therefore, Teflon-bonded electrodes were never a "subject invention" under the patent rights clause of any of the contracts, and as defendant apparently concedes, it has no express license.[6]

In view of these facts, defendant's reliance on the "close umbilical connection" doctrine of *Mine Safety Appliance Co. v. United States,* 176 Ct.Cl. 777, 364 F.2d 385 (1966), is misplaced. In important aspects, the situation here is the reverse of that in *Mine Safety.* In that case, the

---

**6.** Since, under defendant's contracts with plaintiff, Teflon-bonded electrodes were not a "subject invention," expressly licensed to the Government, this is not a situation where, by a subsequently acquired patent, the contractor attempts to dominate rights previously granted to the Government. *Compare, AMP, Inc. v. United States,* 389 F.2d 448, 182 Ct.Cl. 86 (1968), *cert. denied,* 391 U.S. 964, 88 S.Ct. 2033, 20 L.Ed.2d 878.

court found that the contractor's allegedly separate project was in fact obtaining benefits from the Government sponsored and financed project being carried on at the same time. In this case, the benefits flow the other way. While the batteries it procured from plaintiff incorporated the Teflon-bonded electrode technology of claims 4 and 7, defendant contributed nothing at all to that development. Moreover, through plaintiff's unilateral action in acquiring the Elmore and Tanner application, any liability defendant may have had to the Kettering Foundation by reason of these contracts with plaintiff was eliminated, again at no cost to defendant. Having received those benefits without the expenditure of any federal funds, and having failed to demonstrate any umbilical relationship between the work of Elmore and Tanner in 1958 and the procurement of batteries in 1966, defendant is not entitled to a license under this patent.[7]

*Moos Patent No. 3,276,909*

This patent discloses an electrode consisting of a polymeric film that serves as a backing or support for the catalytic layer. The patent suggests that either hydrophilic or hydrophobic polymers could be used, polytetrafluoroethylene being listed as one suitable polymer. If a hydrophilic material is selected, the patent specifies that it should be oriented so it is in contact with the electrolyte; if a hydrophobic material is used, the patent discloses it should be oriented so it is in contact with the gas.

■ Claim 9, the only claim at issue, provides:

A fuel cell for the generation of electrical energy directly from a fuel and oxidant comprising an electrolyte, at least one oxidizing electrode, at least one fuel electrode, said electrodes being in contact with said electrolyte, and means for providing fuel cell reactants to said electrodes, ate [*sic*] least one of said electrodes comprising a porous hydrophobic polymer matrix having a porous conductive catalytically

activating metal layer in intimate contact with one surface, the said catalytically activating metal layer being in contact with the electrolyte of the fuel cell.

The principal prior art on which defendant relies for its contention of obviousness is Williams Patent No. 3,116,170. That patent was also the principal prior art relied on by the Patent Office. It discloses a hydrophilic support for a catalytic layer oriented with the hydrophilic material in contact with the electrolyte. Claim 9 differs in that a hydrophobic material is specified and the orientation is the reverse of that shown in Williams.

In considering the unobviousness of these differences, *Graham v. John Deere, supra,* it is pertinent that Teflon-backed electrodes have now been widely adopted in the industry and are recognized as one of the most efficient electrodes known. In light of the greatly improved performance of this type of electrode, two factors are particularly significant on the obviousness issue. As explained more fully in finding 19, the orientation of the Moos electrode was contrary to accepted practice in the art. This is evidence of nonobviousness. *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Moreover, General Electric, in its extensive work in this same area, failed to adopt a similar orientation until over 1½ years after Moos, and then found the good performance of the electrode to be surprising. (Finding 20.) That too is an indication of nonobviousness. *Jones Knitting Corp. v. Morgan,* 361 F.2d 451, 457–8 (3d Cir. 1966).

The most pertinent prior art being that already considered by the Patent Office, and in view of the foregoing facts, it is concluded that claim 9 is valid.

■ Defendant also contends that the patent is unenforceable because, in an affidavit submitted to the Patent Office to distinguish the claim from the Williams reference, the inventor Moos stated that he holds a doctoral degree when, as plaintiff now stipulates, he does

7. The suggestion that plaintiff reshaped the Elmore and Tanner application based on inputs from Government contract work is without any evidentiary support.

not. It is, of course, well settled that misstatements of fact in representations to the Patent Office may render the patent unenforceable. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 82 S.Ct. 347, 15 L.Ed.2d 247 (1965). The general rule, however, is that the misrepresentation must be relevant and material to the deliberations of the Patent Office. *Tate Engineering, Inc. v. United States,* 477 F.2d 1336, 201 Ct.Cl. 711 (1973); *Henkels & McCoy, Inc. v. Elkin,* 316 F.Supp. 303 (W.D.Pa.1970), *aff'd* 455 F.2d 936 (3d Cir. 1972). Here, the file wrapper history reveals that the purpose of the affidavit was to report the results of certain tests conducted in plaintiff's laboratory. The file history further indicates that it was the substance of the test results set out in the affidavit, not the degrees held by the affiant, that resulted in the allowance of claim 9. Since there was no factual error in the affidavit as to the tests conducted or the results thereof, the misstatement regarding Moos' educational background is deemed to be immaterial. Accordingly, the defense of unenforceability cannot be sustained.

■■■ Defendant also contends that claim 9 is not infringed. In large part, this is based on the assertion that a metal/air battery is not a "fuel cell." However, the Patent Office has stipulated to the contrary (findings 4, 21), and the evidence is that those in the art recognize this type of battery as a hybrid, having features of both a classic fuel cell and a conventional battery. The '909 patent is concerned with electrode structures and it is particularly in this area that those in the art have recognized the overlap between classic fuel cells and conventional batteries. Accordingly, the distinction defendant seeks to draw cannot be sustained.

Nor can the contention that the BB–626( )/U has no "means for providing fuel cell reactants" be accepted. The one reactant, air, is fed on a continuous basis through openings in the casing. The other reactant, zinc, is supplied on a batch basis each time an anode is replaced. While defendant is correct that the reactants in the embodiment disclosed in the specification are fed continuously, the claim language does not require this. Since a periodic batch replacement is clearly a means of supplying a reactant and since the particular means by which the reactants are fed was neither significant to the prosecution history nor to the invention itself, plaintiff is not limited to the specific mode disclosed. A case of infringement has been made out.

■■■ Finally, defendant contends it has an "implied" license under this patent, relying principally on a Navy contract it had with plaintiff involving work in the area of fuel cells.[8] Although that contract did contain a patent rights clause and was still open at the time Moos made his invention, the facts clearly show that the electrode was neither conceived nor reduced to practice in the performance of work called for or required under that contract. Moos' work was financed by in-house funds, and it did not pertain to any aspect of the particular work then being performed under that contract. Defendant has no license. *Erie Resistor Corp. v. United States,* 279 F.2d 231, 150 Ct.Cl. 490 (1960).

### *Giner Patent No. 3,438,815*

■■■ This patent discloses an electrode which includes a micro-porous metal layer for controlling bubble pressure, the pore size of the layer being about 1 to 50 microns in diameter.

Each of 12, 15, and 16, the only claims in issue, calls for a "porous self-sustaining metal layer of uniform and controlled porosity," this metal layer clearly referring to the micro-porous layer described in the specification. The accused battery has nothing of a similar nature. The current collector, specified by plaintiff as corresponding to the claimed metal layer, is a conventional expanded met-

8. Although defendant also asserts a license under an Air Force contract, it has not identified any specific work performed by plaintiff that would give rise to a license as a result of that contract.

al screen with openings far in excess of 50 microns. While it is porous and self-sustaining and, in a very loose sense, could be said to have a uniform and controlled porosity, it is clear that it is neither intended to perform the function of the micro-porous metal layer disclosed, nor in fact does so. Any effect it would have on bubble pressure would be incidental and entirely insignificant.

It is well settled that more than a literal response to the terms of the claims must be shown to make out a case of infringement. *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); *Marvin Glass & Associates v. Sears Roebuck & Co.,* 448 F.2d 60 (5th Cir. 1971); *Autogiro Co. v. United States,* 384 F.2d 391, 181 Ct.Cl. 55 (1967), *rehearing denied,* 184 Ct.Cl. 801 (1968). Since the accused metal layer does not perform substantially the same function in substantially the same way for substantially the same purpose as the patented micro-porous metal layer, there is no infringement and, hence, there can be no liability under this patent. *Dominion Magnesium Ltd. v. United States,* 320 F.2d 388, 162 Ct.Cl. 240 (1963).[9]

*Fishman Patent No. 3,553,024*

 This patent discloses the same basic electrode structure as that in Moos Patent No. 3,276,909, differing only in the requirement that the Teflon film is to be unsintered, *i. e.,* it has not been subjected to temperatures of 327° C. or above.

The difficulty in finding anything unobvious in the claimed combination is insurmountable. In suggesting the use of Teflon, the '909 patent does not distinguish between the sintered and unsintered types of films, but both types were available commercially in 1961 when the Moos patent application was filed. What is clearly taught by Moos, however, is that the Teflon is to be oriented toward the gas, thus requiring diffusion of the gas through the Teflon. In light of that teaching, and the known generally impermeable nature of sintered Teflon (finding 28), it is concluded that it would have been obvious to anyone with any skill at all at the time Fishman made his invention to try a permeable unsintered Teflon in the Moos arrangement. The substitution of an unsintered Teflon film in either of Examples 1 or 2 of the '909 patent would inherently achieve the advantages and benefits claimed by Fishman since none of the process steps in either of those examples would subject the Teflon to temperatures in excess of 327° C. Unsintered Teflon being the logical choice to use, there is nothing patentable in Fishman's selection of that material and claim 1 is deemed to define a combination that is obvious and invalid. *Mills v. Watson,* 96 U.S.App.D.C. 43, 223 F.2d 335 (1955).

Claims 3, 4, and 6, dependent on claim 1, merely add details regarding the Teflon-bonded catalytic layer. Those details are disclosed in the '900 patent and add nothing of patentable significance to the combination of claim 1 when presented in this patent. Claim 11, also dependent on claim 1, merely describes a zinc anode, something notoriously old in the battery field.

Claims 1, 3, 4, 6, and 11 are invalid.

*Oswin et al Patent No. 3,436,270*

 This patent discloses a metal/air battery having a gas permeable cathode of a particular design and a replaceable metal anode. The cathode, described as an envelope, forms a closely fitting pocket or enclosure for receiving the anode and the electrolyte. With this design, the cell is mechanically recharged merely by removing the expended anode from the envelope cathode and inserting a fresh anode.

---

9. While the better practice is to treat both the validity and infringement issues, *Sinclair Co. v. Interchemical Corp.,* 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945), particularly in view of the public interest in the validity issue, *Ditto, Inc. v. Minnesota Mining & Manufacturing Co.,* 336 F.2d 67 (8th Cir. 1964), it is not always necessary to do so. *Dresser Industries, Inc. v. United States,* 432 F.2d 787, 193 Ct.Cl. 140 (1970). Where, as here, noninfringement is clear and invalidity is not plainly evident, it is appropriate to treat only the infringement issue. *Lockwood v. Langendorf United Bakeries, Inc.,* 324 F.2d 82 (9th Cir. 1963).

Claims 1, 2, 3, 5–8, 10, 16, and 17 (all article claims), and claim 19 (a method claim), are asserted to be infringed. Defendant does not contest infringement and it is clear that each of the claims is infringed.

Defendant relies on 11 patents, in various combinations, in support of its contention that the article claims are obvious. (Finding 30.) Of these, only the Heise and Thompson patents disclose a mechanically rechargeable concept. Thompson is not otherwise pertinent, being merely a classic type of railroad battery requiring a large volume of electrolyte. Heise does disclose a flat-cell configuration in which the anode is mechanically replaceable; however, the anode is spaced a substantial distance from the cathodes and this spacing, together with the rigid frame supporting the cathodes, both limits the intimate engagement of the anode, paste electrolyte, and cathode, and requires a substantial volume of the electrolyte. This same structural arrangement was basically employed by General Electric in its work in 1964.[10]

The contribution of Oswin and Chodosh lies in the close-fitting relationship of the replaceable anode and cathodes whereby a minimum volume of electrolyte is required and a high energy and power density cell is achieved. None of the prior art either discloses the same relationship or achieves comparable results. The importance of this relationship is confirmed both by the tests conducted by the defendant (finding 32(b)) and by the fact it was copied in the accused batteries; its unobviousness is revealed by the contemporaneous failure of General Electric and Yardney to ar-

rive at a similar construction. *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.*, 445 F.2d 84, 93 (7th Cir. 1971).

Claim 1[11] is cast in rather broad language but is specifically limited to an "envelope cathode." While language more specific in terms of structure would have been preferable, when construed in light of the specification and the prosecution history, it is apparent that this phrase was intended to describe a cathode structure that closely surrounds and encloses an anode. Clearly, the widely spaced cathodes and boxlike structures of Heise and General Electric are not an *envelope* in the sense intended by the patentees. Moreover, an interpretation of the claim which limits it to the close-fitting relationship disclosed in the specification is consistent with the principle that, where susceptible to more than one construction, that one will be adopted which will preserve to the patentee his actual invention. *Tate Engineering, Inc. v. United States, supra; Dominion Magnesium Ltd. v. United States, supra.* Here the construction most favorable in terms of preserving validity also coincides with the construction placed on the language by the patentees.

As properly construed, it is concluded that claim 1, and the claims dependent thereon, are valid and infringed.

Defendant's contention that it obtained a license under these claims by reason of work under an Air Force contract performed by plaintiff is unsupported by the facts. The evidence, largely exhibits introduced by defendant, is that the en-

10. See findings 31a–f. Contrary to plaintiff's contention, the General Electric work was not abandoned, suppressed or concealed. Its work in 1964, although it did not result in a battery of a character suitable for commercial use, was sufficient to demonstrate operativeness. Its continued work throughout the latter part of 1964 and early 1965, its periodic reports to its customer, the prompt filing of a patent application when the project was concluded, the subsequent papers it published, and its attempt to sell the battery to the Marine Corps, negate the contention that G.E. abandoned, suppressed or concealed the battery. *Interna-*

*tional Glass Co. v. United States,* 408 F.2d 395, 187 Ct.Cl. 376 (1969).

11. Claim 1 is as follows:

"An improved metal-air or metal-oxygen electrochemical cell containing a gas permeable envelope cathode comprising a hydrophobic polymer membrane and a conductive catalytic coating on the inner surface of said membrane, a replaceable metal anode positioned within said envelope cathode, an electrolyte in the space separating the cathode and anode, and means for retaining said anode in said envelope cathode and permitting its ready removal."

velope cathode and mechanical-recharge concept were conceived and reduced to practice by plaintiff prior to its entering into the contract. (Findings 34a–e.) Merely because plaintiff later used aspects of that technology in the performance of its contract does not give defendant any rights under the patent. *Eastern Rotorcraft Corp. v. United States,* 384 F.2d 429, 181 Ct.Cl. 299 (1967). Defendant received the benefit of that technology without paying for its development; it does not also get a royalty-free license.

As to method claim 19,[12] each of the recited method steps is inherent both in the Heise and the earlier G.E. work. The only distinction over the prior art lies in the envelope cathode structure set out in the claim. However, it is generally the rule that patentability of a method claim must rest on the method steps recited, not on the structure used, unless that structure affects the method steps. A. Deller, Patent Claims § 372 (2d ed. 1971). In this case, it is apparent that the claimed method steps are not affected by the claimed cathode structure since the very same method would be used with the box cathode of Heise.

There can be no doubt that the invention of the '270 patent lies in the envelope cathode structure, not in the known method of recharging a battery by replacement of an anode. That old method cannot be transformed into a patentably new one merely by using it to recharge a battery having a cathode not shown in the prior art. *Pierce v. Muehleisen,* 226 F.2d 200 (9th Cir. 1955); *Chenault v. Nebraska Farm Products, Inc.,* 138 F.Supp. 772 (D.Neb.1956). In short, claim 19 purports to define a new method and its validity must be assessed on the basis of the method steps described. Failing to define a method that is distinguishable from the prior art methods, claim 19 is held to be invalid.

### Rosansky Patent No. 3,378,406

This patent discloses a metal/air battery of the same type and construction as disclosed in the '270 patent, Rosansky's contribution being a system of specially designed spacers that separate the adjacent cells to provide access of air to the cathodes.

The use of spacers to provide a flow path for a gas between adjacent electrode surfaces is notoriously old and those in the battery art were, long prior to Rosansky's work, familiar with the function of spacers in stacked electrodes. (Finding 36.) Plaintiff's contention that the particular spacers designed by Rosansky control the growth of the cell can be given no weight since it is much narrower than the language of the claims. The claims are the measure of the invention and validity must be determined on the basis of what is claimed. *Kemode Manufacturing Co. v. United States,* 347 F.2d 315, 171 Ct.Cl. 698 (1965); *Chesterfield v. United States,* 159 F.Supp. 371, 141 Ct.Cl. 838 (1958). Claim 1[13] merely

---

12. *Claim 19:*

"The method of generating electricity employing a metal/air or metal/oxygen electrochemical cell having a replaceable and consumable metal anode positioned within a gas permeable nonconsumable envelope cathode comprising a hydrophobic polymer membrane and a conductive catalyst layer on the inner surface of said membrane and an electrolyte separating said anode and cathode, said method comprising the steps of discharging said consumable metal anode by applying a load to said electrochemical cell, removing the discharged anode from said non-consumable [*sic*] envelope cathode and inserting a fresh or charged anode into said envelope cathode."

13. Claims 1, 3, 8, and 9 are in issue and provide as follows:

"1. An improved metal/air or metal/oxygen electrochemical battery comprising a plurality of electrochemical cells each containing an envelope cathode comprising a hydrophobic polymer membrane and a conductive catalytic layer on one major surface of said membrane, said one major surface comprising the inner surface of said cathode, a metal anode positioned within said envelope cathode, and an electrolyte in the space separating the cathode and anode, intercell spacer elements between adjacent cells, said spacer elements having openings therein to permit access of gaseous oxidant to said envelope cathodes, at least one of said spacer elements being arranged in said battery in such manner that said oxidant contacts at least one surface of at least two of said envelope cathodes only through the openings in said spacer elements."

\* \* \* \* \* \*

calls for spacer elements; it does not relate those spacer elements to the cathode surfaces such that cell growth would be controlled. It is not enough that the particular spacers shown in the drawings may be new and novel or perform a new function. Patent claims are required for the very purpose of forcing the patentee to insert in the *claims* those limitations and relationships regarded to be the invention. *Strumskis v. United States,* 474 F.2d 623, 200 Ct.Cl. 668, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *cf. Alma Motor Co. v. United States,* 134 F.Supp. 641, 133 Ct.Cl. 59 (1955).

By casting claim 1 in overly broad language, the patentee has simply failed to provide a structural bridge between the desirable functional results said to be achieved and the mechanism by which those results are obtained. As broadly claimed, the combination of a plurality of cells with spacers therebetween does not distinguish from the G.E. battery or stacked cells of the Heise type.

While claim 1 is expressly limited to envelope cathodes, and defendant has not cited any prior art showing stacked envelope cathodes with spacers, that does not alter the obviousness conclusion. Plaintiff presents no argument that spacers, when used with envelope cathodes, achieve any different result or function any differently than when they are used with other kinds of cathodes. Most certainly, there is nothing in the claim to support such a conclusion. Accordingly, the question is simply whether the recitation of an "envelope cathode" in the combination of claim 1 is a sufficient basis on which to sustain the claim.

It is concluded that it is not. Only one patent can be granted for one invention. *Miller v. Eagle Manufacturing Co.,* 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); *Tektronix, Inc. v. United States,* 195 Ct.Cl. 53, 445 F.2d 323 (1971). Envelope cathodes were the invention of Oswin and Chodosh, not Rosansky, and their '270 patent discloses stacked envelope cathodes with spacers. Claim 2 of the '270 patent sets out the same basic combination of a plurality of stacked cells described in Rosansky's claim 1. Although not recited as a specific element, one practicing the combination of claim 2 would necessarily require spacers between the adjacent cells.

Plaintiff cannot proliferate its patent holdings merely by presenting claims which add to the basic envelope cathode arrangement of Oswin and Chodosh mechanical details such as spacers that, as broadly claimed, are obvious to those in the art. *Cf. Pratt & Whitney Co. v. United States,* 345 F.2d 838, 170 Ct.Cl. 829 (1965). In other words, two patents directed to the same combination cannot be sustained where patentability of the claims in both is predicated on the same feature. Since the '270 patent covers the basic envelope cathode invention, and Rosansky's work only purports to be an improvement thereof, it is claim 1 that must fall. *In re Stanley,* 214 F.2d 151, 41 CCPA 956 (1954); *cf. In re Vogel,* 422 F.2d 438, 57 CCPA 920 (1970).

Claim 3 merely adds a battery case having openings. Packaging of cells in a case is notoriously well known, as shown for example in the Hollman et al patent (finding 36) wherein the case holds the cells in an assembled relationship. Merely providing openings in the case for allowing air to reach an air-breathing electrode, which is all the claim requires, is an obvious concept.

Claims 8 and 9 add only details regarding the electrolyte and the Teflon backing of the electrode. These features were not the invention of Rosansky and

---

"3. The improved battery of claim *1* including means for retaining said plurality of cells and said intercell spacer elements in operable structural association comprising an outer casing having openings therein to permit access of air or oxygen to the envelope cathode."

\* \* \* \* \* \*

"8. The improved battery of claim *1* wherein the electrolyte of the electrochemical cell is trapped in a matrix."

"9. The improved battery of claim *8* wherein the metal anode is zinc, the hydrophobic polymer membrane of the envelope cathode is polytetrafluoroethylene, and an alkaline hydroxide electrolyte is trapped in a paper matrix."

were, at the time of his work, known in the art. They add nothing of patentable significance to the combination of claim 1.

Claims 1, 3, 8, and 9 are held to be invalid.

*Moos Patent No. 3,531,327*

This patent discloses a gas and liquid impermeable package containing a consumable metal anode, a separator material around the anode, and all of the electrolyte material needed to operate a metal/air cell over the life of the metal anode. This method of packaging the anode permits mechanical recharging of the metal/air cell of the '270 patent without the need for bottles of corrosive electrolyte material.

Defendant does not seriously assert noninfringement but attacks validity, as well as contends for a license. Because of the conclusion that the license defense is a sound one, it is unnecessary to consider the issue of validity.[14]

Plaintiff developed the mechanical-recharging concept under its own in-house program and, by September 1965, had commenced packaging anode-electrolyte composites in polyethylene bags to test their shelf life. These shelf-life tests continued at a low level of activity until April 1966 when a comprehensive program to investigate the parameters affecting shelf life of packaged anodes was commenced. Up to that time, all of the packaging had been with polyethylene. Commencing in the early part of 1966, plaintiff entered into a series of contracts with defendant regarding the supply of mechanically rechargeable metal/air batteries. The packaging of anodes was part of the work under these contracts. Plaintiff continued its evaluation and work on packaging of anodes until October 1967, by which time it was determined that polyethylene was unsatisfactory due to its permeability. A composite of Mylar, polyethylene, and aluminum foil was then used to package the anodes.

The nature of the '327 invention is such that its workability, a prime re-

quirement for a reduction to practice, *Eastern Rotorcraft Corp. v. United States, supra,* could not be ascertained until after the packaged anode-electrolyte composite had been subjected to suitable shelf-life tests. Those tests revealed that the polyethylene was unworkable because it did not provide a substantially liquid impermeable envelope. Since claim 1 expressly requires a liquid impermeable envelope, and since that limitation is of critical importance to achieving the objectives of the invention, it is apparent that there was no reduction to practice of the invention through use of the polyethylene. A workable material satisfactorily meeting the requirements of claim 1 was not found until 1967, at the time and during the course of work under contracts with defendant. (Findings 38, 39.)

The standard patent rights provision contained in plaintiff's contracts gives defendant a license under any invention "first actually reduced to practice" in the course of the contract. In view of the foregoing facts, it is clear that defendant has a license under the combination of claim 1, as well as dependent claims 2, 3, 8, and 9.

## Addendum

Because of the number of patents involved and the need to treat each patent individually, a few matters that either could not or should not be so compartmentalized remain to be mentioned.

While it is difficult to assess, on an individual basis, the relative contributions of the inventions of the '900, '909, and '270 patents to the success of the BB–626( )/U, there is no doubt that they were of substantial importance. In head-on competition with the conventional silver/zinc battery, the BB–626 proved to be superior beyond any question. (Finding 40(c).) For example, the conventional battery required 10 hours to recharge while plaintiff's battery requires only 10 *minutes.* It proved to be lighter, with greater capacity and higher power levels. This superiority was in

large part due to the Teflon-bonded electrode (covered by the '900 patent), the Teflon backing of the electrode (covered by the '909 patent), and the envelope configuration of the cathode and its mechanical rechargeability (covered by the '270 patent). This is further evidence of the validity of these patents.

On the license issue, defendant has two arguments that have not been mentioned. The first is that the whole history of the dealings between the parties leads to the conclusion that it was the mutual effort of both plaintiff and defendant that led to the creation of the accused devices. A review of that history, however, rather readily reveals that this argument is not supported by the facts and must be rejected. Basically, the contracts between the parties fall into two categories, one for work on fuel cells and the second relating to metal/air batteries. The fuel-cell work was performed in the late 1950's and early 1960's and was related to Bacon-type cells with biporous nickel electrodes.[15] The technology of biporous nickel electrodes is a separate subject and quite unrelated to the Teflon bonded-and-backed electrodes here in issue. The parties did not have any dealings on metal/air batteries until mid-1965, at the earliest. By then, plaintiff already had developed, tested, and demonstrated, with its own funds, the basic zinc/air battery that became the BB–626.

In sum, plaintiff's work on Bacon cells did not generate, nor was it related in any way to, the inventions here in issue while the metal/air contracts were after the fact and dealt only with militarization and procurement of the batteries. To the extent patentable innovations were made under these latter contracts, defendant has already received express licenses from plaintiff (finding 42).

This leads to the second of defendant's points which is that, because it is expressly licensed under certain patents covering improvements made by plaintiff during the course of militariz-

ing the battery, it argues it should receive a license to practice the inventions in plaintiff's basic patents. This contention has no substance, particularly in light of the express language in the contract documents which limits defendant's rights to "subject inventions" made under the contract, and the language of the express license agreements which states that the Government shall not obtain a license "by implication or otherwise" to any inventions other than those expressly licensed. *Eastern Rotorcraft Corp. v. United States, supra; Erie Resistor Corp. v. United States, supra.*

**HIGHWAY PRODUCTS, INC.**

v.

**The UNITED STATES.**

No. 48–73.

United States Court of Claims.

Jan. 28, 1976.

---

**15.** Previous to these contracts, plaintiff had acquired the rights to the Bacon technology which, in the early 1960's, had the highest

theoretical current density of any known fuel cell.